1

**BLANK ROME LLP**
2
Howard M. Knee (SBN 55048)
knee@blankrome.com
3
Natalie Alameddine (SBN 296423)
nalameddine@blankrome.com
4
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
5
Telephone:     424.239.3400
Facsimile:     424.239.3434
6

7
**BLANK ROME LLP**
Anthony B. Haller (*pro hac vice to be submitted*)
8
haller@blankrome.com
Leigh Ann Buziak (*pro hac vice to be submitted*)
9
lbuziak@blankrome.com
One Logan Square
10
Philadelphia, PA 19103
Telephone:     215.569.5500
11
Facsimile:     215.832.5500
12

*Attorneys for Plaintiffs*
13
*Auris Health, Inc. and Verb Surgical Inc.*

14

15
# UNITED STATES DISTRICT COURT

16
# NORTHERN DISTRICT OF CALIFORNIA

17

18
AURIS HEALTH, INC.,
VERB SURGICAL INC.
19

20
                              Plaintiff,

21
        vs.

22
 KALPITKUMAR GAJERA,

23

24
                              Defendant.

25

26

27

28

Case No. 3:21-cv-5337

**VERIFIED COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs Auris Health, Inc. ("Auris Health") and Verb Surgical Inc. ("Verb") (collectively, "Plaintiffs"), bring this suit against Defendant Kalpitkumar Gajera ("Gajera" or "Defendant") and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action seeking injunctive and equitable relief, as well as damages, to prevent Gajera from using, disclosing, or distributing their confidential, proprietary, and trade secret information in his new employment with Noah Medical Corporation ("Noah Medical"), which was misappropriated by Gajera on his last day of employment with Plaintiffs, and to prevent any further misappropriation of Plaintiffs' information by the dozen former employees of Plaintiffs who are currently employed with Noah Medical.

2.      Gajera was formerly employed as a Senior Manager of Project Management Office for Software with direct responsibility and knowledge of the highly confidential software, firmware, and robotics controls and algorithms that runs one of the medical robotics platforms that Plaintiffs are currently developing.

3.      The project Gajera was working on is under development and the details are highly confidential.

4.      Gajera resigned from his employment with one week's notice.

5.      Gajera's last day of employment with Verb was Friday, June 18, 2021, which was a "Summer Friday," meaning that Gajera's team had the afternoon off.

6.      On the afternoon of June 18, 2021, without any valid business purpose, Gajera downloaded the entire requirement set for Plaintiffs' robotics platform.

7.      The information Gajera downloaded on his last day of employment provides a roadmap of the features and functionality of Plaintiffs' robotics system, including the system business requirements, the design input requirements and the customer input requirements.  The functionality of these systems is still under development and is highly confidential.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

8. At the time of his resignation, Gajera did not disclose where he would be working next. Plaintiffs have discovered that Gajera is now employed with Noah Medical Corporation, a direct competitor of Plaintiffs.

9. In addition to Gajera, Noah Medical has recently hired nearly a dozen of Plaintiffs' employees to staff its competing medical robotics business in key positions, placing Plaintiffs' confidential information at risk.

10. Through this action, Plaintiffs seek to prevent Gajera from possessing, using, and distributing their confidential, proprietary, and trade secret information in violation of Gajera's contractual obligations, the Defend Trade Secrets Act, and the California Uniform Trade Secrets Act.

**PARTIES**

11. Plaintiff Auris Health, Inc. is a Delaware corporation with its principal place of business in Redwood City, California.

12. Plaintiff Verb Surgical Inc. is a Delaware corporation with its principal place of business in Santa Clara, California.

13. Auris and Verb are part of the Johnson & Johnson Medical Devices Companies and are currently working together on developing a surgical robotics platform called the OTTAVA™ system, which Gajera worked on during his employment.

14. Defendant Kalpitkumar Gajera is an individual residing in Union City, CA.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 and 1367, and 18 U.S.C. § 1836. This Court has supplemental jurisdiction over the state law claims asserted herein because they are related to, arise from a nucleus of operative facts as, and are part of the same case and controversy as Plaintiffs' federal claim.

16. Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

## FACTUAL BACKGROUND

## PLAINTIFFS' PROPRIETARY ROBOTICS TECHNOLOGY

17.     Plaintiffs Auris Health and Verb Surgical are part of the Johnson & Johnson Medical Devices Companies and are worldwide leaders in the highly competitive medical robotics industry. Auris and Verb design, develop, manufacture, market, and sell medical robotic systems for use in diagnostics, such as biopsies, and surgery. Auris has already developed a robot for use in bronchoscopies to detect lung cancer, and Auris and Verb have been partnering on the development of a robot for use in surgery.  The details of the Auris and Verb collaboration are highly confidential, and Plaintiffs have purposefully provided very little information publicly given the highly competitive nature of this industry and the race to market.

18.     Medical robotics and surgical robotics are highly specialized fields involving the use of robots to engage in providing medical care, including surgery, which involves significant risks and demands detailed, specialized knowledge. For these reasons, Auris and Verb invest time and resources to design, develop, and produce top-quality medical robotics technology, including the software systems that run the robotics technology.

19.     The medical robotics industry in which Auris and Verb are engaged is highly competitive. To compete and better serve their customers and the patient community, Auris and Verb invest millions of dollars annually in the development of technologies, platforms, and products designed to optimize patient outcomes and advance medical science. As a result, the protection of Auris' and Verb's confidential, proprietary, and trade secret information, business relationships, and goodwill, is vital to protect their investments in their development and commercialization efforts and to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.

20.     Auris and Verb protect their business relationships and confidential information by, among other things, requiring employees, as a condition of employment, to agree not to disclose confidential and/or proprietary information and to ensure the return of any such information at the termination of their employment.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

21.     In exchange for executing these agreements, Auris and Verb promise to provide and do provide their employees with access to their valuable confidential and trade secret information on a need to know basis, training, access to customer relationships, and related goodwill.

22.     In addition to requiring employees to sign confidentiality and non-disclosure agreements, Auris and Verb also protect their trade secret and confidential information by storing them in a physically secure building with a security guard, where employees must sign in to access the building.  Employees must also have a functioning key card, issued and authorized by Plaintiffs, to gain access to Plaintiffs' offices.

23.     In addition to these physical security measures, Plaintiffs also protect information stored electronically by requiring users to have validly-issued logins with passwords to log in to Plaintiffs' systems.

24.     Once logged in to Plaintiffs' systems, users are required to have additional logins and passwords to gain access to software applications in which Plaintiffs store their confidential information, including the software code and software requirements for their robotics platform.

**GAJERA'S EMPLOYMENT AND WORK FOR PLAINTIFFS**

25.     Gajera started working for Verb in April 2019 as a Senior Project Manager with responsibility for software development, earning hundreds of thousands of dollars a year.

26.     Verb was a strategic collaboration between Johnson & Johnson and Verily, an Alphabet company.

27.     In December 2019, Johnson & Johnson announced that it was acquiring its remaining stake in Verb, after which Verb became part of the Johnson & Johnson Family of Companies.

28.     Auris and Verb are currently working on the development of a new surgical robotics platform called the OTTAVA™ system.

29.     Plaintiffs have purposefully released very limited information concerning the OTTAVA™ system given the intense competition in the surgical robotics industry.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

30.     During his employment, Gajera was directly responsible for the development of the entire software program for the OTTAVA™ system.  As a result, Gajera had broad access to Auris' and Verb's confidential and trade secret information to perform his job responsibilities.

31.     Gajera had three direct reports with responsibility for software including robotics and controls, firmware, and software testing.

32.     Gajera would regularly meet with his direct reports to provide them guidance and direction, and also frequently connected with directors in charge of software, robotics, and controls.

33.     Gajera was directly responsible for managing the schedules, deliverables, and milestones for the development of the software, and was keenly aware of the milestones and progress of Plaintiffs' development efforts.

34.     Gajera was responsible for directing the team's resources to particular portions of the development of the software.

35.     Gajera further coordinated the software team's milestones with program-level milestones for the entire OTTAVA™ project, and participated in cross-program review meetings.

36.     Gajera was also responsible for developing and approving documents required to obtain regulatory approval that are kept in Plaintiffs' design history files, as well as software testing, and all important elements of the robotics program.

37.     By virtue of Gajera's position of trust and responsibility with Plaintiffs, he had significant access to confidential information related to Plaintiffs' robotics medical technology, including, without limitation, program updates, internal project management, and requirements documents for Plaintiffs' robotics technology.

38.     In particular, the requirements documents outline the software specifications and functionality on different levels, including customer requirements, system requirements, engineering requirements, software requirements, and subsystem requirements.

39.     Plaintiffs have invested substantial time and resources in the development of the requirement set for its OTTAVA™ platform, and they would be extremely valuable to a competitor, providing a roadmap of Plaintiffs' plans for its OTTAVA™ platform as well as the status of

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs' work on this project.  All of these systems are still currently under development and are highly confidential.  Plaintiffs have purposefully refrained from releasing details concerning the functionality of its OTTAVA™ system.

## GAJERA'S OBLIGATIONS UNDER HIS AGREEMENT

40.     In connection with and in consideration of his employment with Verb, Gajera executed an Employee Confidential Information and Inventions Assignment Agreement (the "Agreement") on or around April 11, 2019, a true and correct copy of which is attached hereto as Exhibit A.

41.     In his Agreement, Gajera explicitly agreed to hold in confidence and not disclose, use, lecture upon, or publish any of the Company's Confidential Information, and recognized that all Confidential Information shall be the sole and exclusive property of Company and its assigns.  The nondisclosure provision provides as follows:

**1.1     Nondisclosure; Recognition of Company's Rights.** I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein.  At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any of Company's Confidential Information (defined below), except as may be required in connection with my work for Company, or as expressly authorized by the CEO of the Company.  I will obtain the CEO's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that relates to my work at Company and/or incorporates any Confidential Information.  I hereby assign to Company any rights I may have or acquire in any and all Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns.

42.     Confidential Information is further defined in paragraph 1.2 of the Agreement as follows: "any and all confidential knowledge, data or information related to Company's business or its actual or demonstrably anticipated research or development, including without limitation (a) trade secrets, inventions, ideas, processes, computer source and object code, data, formulae, programs,

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques; (b) information regarding products, services, plans for research and development, marketing and business plans, budgets, financial statements, contracts, prices, suppliers, and customers; (c) information regarding the skills and compensation of Company's employees, contractors, and any other service providers of Company; and (d) the existence of any business discussions, negotiations, or agreements between Company and any third party."

43.     Paragraph 4 of the Agreement provides that, upon termination, Gajera would "deliver to Company all of Company's property, equipment and documents, together with all copies thereof, any other material containing or disclosing any Inventions, Third Party Information or Confidential Information and certify in writing that I have fully complied with the foregoing obligation." Ex. A at ¶ 4.

44.     In paragraph 4, Gajera also agreed that he would "not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company."  Ex. A at ¶ 4. Further, if Gajera "used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, [he] agree[d] to provide the Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and [he] agree[d] to provide the Company access to [his] system as reasonably requested to verify that the necessary copying and/or deletion is completed." Id. Gajera promised that he would certify his compliance with the requirements of this paragraph. Id.

45.     Accordingly, Gajera was well aware that he should not keep or be in possession of any of Plaintiffs' confidential information following the termination of his employment.

46.     The Agreement signed by Gajera provides that it "shall survive the termination of my employment and the assignment of this Agreement by Company to any successor or other assignee and shall be binding upon my heirs and legal representatives."  Ex. A at ¶ 6.3.

47.     In the Agreement, Gajera also acknowledged that "because my services are personal and unique and because I will have access to the Confidential Information of Company, any breach

7

of this Agreement by me would cause irreparable injury to Company for which monetary damages would not be an adequate remedy, and therefore, will entitle Company to injunctive relief (including specific performance).  The rights and remedies provided to each party in this Agreement are cumulative and in addition to any other rights and remedies available to such party at law or in equity." Ex. A at ¶ 6.6.

48.   At all material times, Auris and Verb acted in accordance with and in reliance on the Agreement.

## GAJERA'S RESIGNATION AND BREACHES OF HIS AGREEMENT

49.   On June 10, 2021 Gajera provided one week's notice of his resignation, and his last day of employment was scheduled for June 18, 2021.

50.   Gajera did not disclose where he was going to work.

51.   June 18, 2021 was a Friday, and it was Gajera's last afternoon of his last day of employment.  It was a "Summer Friday," and Gajera's team had been given the afternoon off.

52.   Without any business purpose, Gajera downloaded the entire requirement set for the OTTAVA™ platform, including the system and subsystem business requirements, the design input requirements, and the customer input requirements for the entire OTTAVA™ platform.  These are highly confidential and proprietary trade secret documents that disclose proprietary information concerning Auris' and Verb's surgical robotics system that are under development and are not yet on the market.

53.   Upon information and belief, Gajera downloaded these files onto an external hard drive.

54.   Immediately following his last day of employment, on Monday, June 21, 2021, Gajera began employment with Noah Medical, a direct competitor of Plaintiffs in the medical robotics industry, including in the surgical robotics space.

55.   Accordingly, Gajera was in possession of the complete set of Plaintiffs' highly confidential system requirements when he began working for his new employer and during the first week of his employment with Noah Medical.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

56.     Upon information and belief, Noah Medical has less than 100 employees.  Over the past twelve months, Noah Medical has hired a dozen of Plaintiffs' employees to fill key positions within the Noah Medical organization. For example, the following roles at Noah Medical are held by former employees of Plaintiffs: Head of Research & Innovation Software; Director, R&D; VP of Research and Innovation; Senior Director of Operations; Senior Manufacturing Manager; Senior Systems Manufacturing Engineer; and Senior Director, Product Strategy & Clinical Engineering.

57.     Each of these individuals was bound by ongoing confidentiality and nondisclosure obligations like Gajera's.  Having these individuals work together on a competitive project places Plaintiffs' confidential information at increased risk.  Knowledge of Plaintiffs' systems, processes and confidential development plans would provide substantial competitive advantage to Noah Medical.

58.     On June 24, 2021, Plaintiffs sought the required assurances from Gajera that he had complied with paragraph 4 and would provide the required certifications that he had returned Plaintiffs' Confidential information, including on any personal devices or accounts used during his employment.

59.     In response, Gajera conceded to violating the Agreement.  Following Plaintiffs' advising Gajera of their discovery of his downloading their information on his last day of work, Gajera admitted to downloading and transferring Plaintiffs' system requirements to an external hard drive and claimed that thereafter he copied the requirements back onto his Plaintiffs-issued laptop and returned it.

60.     Following the Plaintiffs' inquiries regarding the use of its information, Gajera sent the external hard drive to Plaintiffs' forensic experts for inspection and has not yet agreed that Plaintiffs may inspect these external drives.

61.     On June 25, 2021, Plaintiffs sought similar assurances from Noah Medical, having learned that Gajera was working for this direct competitor.  In response, Noah Medical has placed Gajera on leave pending resolution of these issues and has taken possession of the Noah Medical-issued laptop it provided to Gajera.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

62.     Unless enjoined, Gajera may continue to benefit from his unlawful conduct and may imminently inflict substantial and irreparable harm on Plaintiffs, including through ongoing use of confidential and trade secret information and Gajera's violations of his Agreement.

## COUNT I

## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 et seq.

63.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

64.     Gajera misappropriated Plaintiffs' Confidential Information, including the entire set of confidential requirements for Plaintiffs' cutting-edge robotics technology, all of which constitute protectable trade secrets, owned by Plaintiffs, as set forth in 18 U.S.C. § 1839(3).

65.     At all material times, Plaintiffs' Confidential Information has been, or has been related to, a product or service used in, or intended for use in, interstate or foreign commerce.

66.     At all material times, Plaintiffs' Confidential Information has derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

67.     At all material times, Plaintiffs took reasonable measures to keep their Confidential Information secret, including by, among other things, requiring their employees to sign agreements containing confidentiality covenants and by taking other reasonable measures described above, including physical and electronic barriers to access Confidential Information.

68.     Other than through Gajera's improper disclosure, the trade secrets are not known to third parties and are not readily ascertainable by proper means to person who could derive value from their disclosure or use.

69.     Gajera's misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

70.     Gajera misappropriated Plaintiffs' trade secrets by improper means and without authorization, including by downloading Confidential Information from Plaintiffs' systems on his last date of employment, putting that Confidential Information on an external hard drive, and taking

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

it into his personal possession when he knew or had reason to know that he was using improper means to do so.

71.     Gajera had no business purpose for accessing or downloading this information on the afternoon of his last day of employment.

72.     Gajera continued to misappropriate Plaintiffs' trade secrets and had access and possession to them during his first week of employment with Noah Medical.  As of June 25, 2021, Noah Medical was on notice of Gajera's misappropriation of Plaintiffs' trade secrets.

73.     Gajera's acquisition, disclosure, and use of trade secrets constitutes misappropriation because, at the time of such use and disclosure, he knew or should have known of his confidentiality and loyalty obligations under the Agreement.

74.     Gajera's current and continued misappropriation of Plaintiffs' trade secrets is reckless and malicious.  Gajera knows of the confidentiality restrictions on Plaintiffs' trade secrets.

75.     If Gajera is not enjoined from using or disclosing Plaintiffs' trade secrets, there is an imminent risk that he will continue to misappropriate or use Plaintiffs' Confidential Information for his own benefit and the benefit of his new employer and/or to Plaintiffs' detriment.

76.     As a direct and proximate result of Gajera's conduct, Plaintiffs have suffered, and if Gajera's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages.

77.     Due to Gajera's willful, malicious, and unlawful conduct, Plaintiffs demand and are entitled to compensatory damages, exemplary damages, and attorney's fees and costs in amounts to be proven at trial.

78.     Because Plaintiffs' damages cannot be adequately compensated through remedies at law alone, Plaintiffs also seek preliminary and permanent injunctive relief to prevent Gajera from continuing to possess, disclose or use Plaintiffs' Confidential Information and for expedited discovery to recover Confidential Information from Gajera and from anyone to whom he wrongfully conveyed or disclosed such information.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

79.     By reason of the above-alleged acts and the conduct of Gajera, Plaintiffs have been damaged, and will continue to suffer irreparable harm absent injunctive relief from this Court.

## COUNT II

## VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT,

## CIVIL CODE § 3426, et seq.

80.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

81.     Gajera misappropriated Plaintiffs' Confidential Information, including the entire set of confidential requirements files for Plaintiffs' cutting-edge robotics technology, all of which constitute protectable trade secrets, owned by Plaintiffs, as set forth in Cal. Civ. Code § 3426.1(d).

82.     At all material times, Plaintiffs' Confidential Information has derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

83.     At all material times, Plaintiffs took reasonable measures to keep their Confidential Information secret, including by, among other things, requiring its employees to sign agreements containing confidentiality covenants and by taking other reasonable measures described above, including physical and electronic barriers to access Confidential Information.

84.     Other than through Gajera's improper disclosure, the trade secrets are not known to others and are not readily ascertainable by proper means to other persons who could derive value from their disclosure or use.

85.     Gajera's misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Gajera misappropriated Plaintiffs' trade secrets by improper means and without authorization, including by downloading Confidential Information from Plaintiffs' systems on his last date of employment, putting that Confidential Information on an external hard drive, and taking it into his personal possession when he knew or had reason to know that he was using improper means to do so.  Gajera had no business purpose for accessing or downloading this information on the afternoon of his last day of employment.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

86.     Gajera continued to misappropriate Plaintiffs' trade secrets and had access and possession to them during his first week of employment with Noah Medical.  As of June 25, 2021, Noah Medical was on notice of Gajera's misappropriation of Plaintiffs' trade secrets.

87.     Gajera's disclosure and use of trade secrets constitutes misappropriation because, at the time of such use and disclosure, he knew or should have known of his confidentiality and loyalty obligations under the Agreement.

88.     Gajera's current and continued misappropriation of Plaintiffs' trade secrets is reckless and malicious.  Gajera knows of the confidentiality restrictions on Plaintiffs' trade secrets.

89.     If Gajera is not enjoined from using or disclosing Plaintiffs' trade secrets, there is an imminent risk that he will continue to misappropriate or use Plaintiffs' Confidential Information for his own benefit and the benefit of his new employer and/or to Plaintiffs' detriment.

90.     As a direct and proximate result of Gajera's conduct, Plaintiffs have suffered, and if Gajera's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages.  Due to Gajera's willful, malicious, and unlawful conduct, Plaintiffs demand and are entitled to compensatory damages, exemplary damages, and attorney's fees and costs in amounts to be proven at trial.

91.     Because Plaintiffs' damages cannot be adequately compensated through remedies at law alone, Plaintiffs also seek preliminary and permanent injunctive relief to prevent Gajera from continuing to possess, disclose or use Plaintiffs' Confidential Information and for expedited discovery to recover Confidential Information from Gajera and from anyone to whom Gajera wrongfully conveyed or disclosed such information.  By reason of the above-alleged acts and the conduct of Gajera, Plaintiffs have been damaged, and will continue to suffer irreparable harm absent injunctive relief from this Court.

## COUNT III

## BREACH OF CONTRACT

92.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

93.     Verb and Gajera entered into the Agreement on or about April 11, 2019 where Gajera understood and acknowledged that his employment "creates a relationship of confidence and trust with respect to Company's Confidential Information . . . and that Company has a protectable interest therein" and in which he agreed to "hold in confidence" and not "disclose, use, lecture upon, or publish any of Company's Confidential Information."  Ex. A.  Gajera further agreed to return all information and property upon the termination of his employment, and to provide certifications of his compliance with the provisions of the Agreement.

94.     Gajera breached the Agreement by, without limitation: wrongfully and without authorization acquiring, possessing, using, and/or disclosing Plaintiffs' Confidential Information for his benefit; intentionally taking Plaintiffs' information and uploading it onto an external hard drive; and by continuing to possess Plaintiffs' Confidential Information during his employment with a direct competitor.  Gajera has also failed to provide the certifications of compliance with paragraph 4 of the Agreement.

95.     Gajera's breach of the Agreement has caused Plaintiffs to suffer damages to be fully determined at trial.

96.     Because Plaintiffs' damages cannot be adequately compensated through remedies at law alone, Plaintiffs also seek preliminary and permanent injunctive relief to recover its Confidential Information from Gajera and from anyone to whom Gajera wrongfully conveyed or disclosed such information, and to prohibit Gajera from continuing to disclose and use Plaintiffs' Confidential Information.  Plaintiffs have been deprived of their rights in their property and will continue to suffer irreparable harm absent injunctive relief from this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs Auris Health, Inc. and Verb Surgical Inc. demand a jury trial on all causes of action triable by jury in the above complaint.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request the following:

1.     Plaintiffs' attorney's fees;

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

2.      All costs incurred in this suit;

3.      Compensatory damages;

4.      Actual damages that Plaintiffs are entitled to recover as a result of Defendant Gajera's violation of the Agreement;

5.      Incidental, consequential, and punitive damages, including enhanced damages, as permitted by law;

6.      Such other and further relief as the Court deems just and proper; and

7.      That a temporary restraining order, preliminary, and permanent injunction be entered against Gajera and all persons or entities acting in concert with them:

A.      prohibiting Gajera from possessing, using, disclosing, or transmitting any of Plaintiffs' Confidential Information and/or trade secrets;

B.      prohibiting Gajera from violating the terms of the Agreement;

C.      requiring Gajera to account for and immediately return all documents, records, and materials containing or reflecting such Confidential Information, and all copies thereof;

D.      requiring Gajera to ensure that Plaintiffs' Confidential Information does not exist on Gajera's computers, smartphones, devices, e-mail accounts, cloud storage services, or other repositories of electronic information;

E.      prohibiting Gajera from destroying, altering, transmitting, or moving any documents in whatever form, that may contain or reflect any of Plaintiffs' Confidential Information or trade secrets;

F.      requiring Gajera to provide a written acknowledgement confirming that he has returned all of Plaintiffs' Confidential Information and trade secrets; and

G.      prohibiting or requiring any and all other such acts as the Court deems appropriate for injunctive relief.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

1    DATED:  July 12, 2021                    BLANK ROME LLP

2

3

4                                     By: /s/ Natalie Alameddine
                                          Howard M. Knee
5                                         Natalie Alameddine
                                          Attorneys for Plaintiffs
6                                         Auris Health, Inc. and Verb Surgical Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

1
2
3
**UNITED STATES DISTRICT COURT**
4
**NORTHERN DISTRICT OF CALIFORNIA**
5
6  AURIS HEALTH, INC.,                  Case No.
7  VERB SURGICAL, INC.                  **VERIFICATION**
8                          Plaintiffs,
9        v.
   KALPITKUMAR GAJERA
10
11                          Defendant.
12
13        I, Philippa Gray, in my capacity as Senior Director Program Management for Auris Health,
14  Inc. hereby state that I am familiar with the facts set forth in the foregoing Verified Complaint, am
15  authorized to execute this Verification on behalf of Plaintiffs Verb Surgical, Inc. and Auris Health,
16  Inc., and that the facts set forth therein are true and correct to the best of my knowledge,
17  information and belief.
18        This Verification is made subject to the penalties of 28 U.S.C. § 1746 for unsworn
19  falsification to authorities.
20
21
22
23                                          Philippa Gray
24  Dated: July 9, 2021
25
26
27
28
   4096119999.00238/126331165v.1
   **VERIFICATION**

# EXHIBIT A

## VERB SURGICAL INC.

## EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

In consideration of my employment or continued employment by VERB SURGICAL INC., its direct and indirect subsidiaries, affiliates, successors, predecessors, or assigns, as applicable, (collectively, the "**Company**"), as well as other valuable consideration to be provided to me (including but not limited to the compensation, benefits and other consideration provided to me now and during my employment with the Company), I agree to the terms of this EMPLOYEE INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT (the "**Agreement**"):

1. **CONFIDENTIAL INFORMATION PROTECTIONS.**

    **1.1   Nondisclosure; Recognition of Company's Rights.** I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any of Company's Confidential Information (defined below), except as may be required in connection with my work for Company, or as expressly authorized by the CEO of Company. I will obtain the CEO's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that relates to my work at Company and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in any and all Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

    **1.2   Confidential Information.** The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information related to Company's business or its actual or demonstrably anticipated research or development, including without limitation (a) trade secrets, inventions, ideas, processes, computer source and object code, data, formulae, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques; (b) information regarding products, services, plans for research and development, marketing and business plans, budgets, financial statements, contracts, prices, suppliers, and customers; (c) information regarding the skills and compensation of Company's employees, contractors, and any other service providers of Company; and (d) the existence of any business discussions, negotiations, or agreements between Company and any third party. Further, notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between the Company and me, nothing in this Agreement shall limit my right to discuss my employment or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or any other federal government agency or similar state or local agency or to discuss the terms and conditions of my employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure.

    **1.3   Third Party Information.** I understand that Company has received and in the future will receive from third parties confidential or proprietary information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During and after the term of my employment, I will hold Third Party Information in strict confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, Third Party Information, except in connection with my work for Company or unless expressly authorized by an officer of Company in writing.

    **1.4   No Improper Use of Information of Prior Employers and Others.** I represent that my employment by Company does not and will not breach any agreement with any former employer, including any noncompete agreement or any agreement to keep in confidence or refrain from using information acquired by me prior to my employment by Company. I further represent that I have not entered into, and will not enter into, any agreement, either written or oral, in conflict with my obligations under this Agreement. During my employment by Company, I will not improperly make use of, or disclose, any information or trade secrets of any former employer or other third party, nor will I bring onto the premises of Company or use any unpublished documents or any property belonging to any former employer or other third party, in violation of any lawful agreements with that former employer or third party. I will use in the performance of my duties only information that is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise legally in the public domain, or is otherwise provided or developed by Company.

2018.11.01v2

## 2. INVENTIONS.

**2.1 Definitions.** As used in this Agreement, the term **"Invention"** means any ideas, concepts, information, materials, processes, data, programs, know-how, improvements, discoveries, developments, designs, artwork, formulae, other copyrightable works, and techniques and all Intellectual Property Rights in any of the items listed above. The term **"Intellectual Property Rights"** means all trade secrets, copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country. The term **"Moral Rights"** means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

**2.2 Prior Inventions.** I have disclosed on **Attachment 1** a complete list of all Inventions that (a) I have, or I have caused to be, alone or jointly with others, conceived, developed, or reduced to practice prior to the commencement of my employment by Company; (b) in which I have an ownership interest or which I have a license to use; (c) and that I wish to have excluded from the scope of this Agreement (collectively referred to as **"Prior Inventions"**). If no Prior Inventions are listed in **Attachment 1**, I warrant that there are no Prior Inventions. I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions (defined below) without Company's prior written consent. If, in the course of my employment with Company, I incorporate a Prior Invention into a Company process, machine or other work, I hereby grant Company a non-exclusive, perpetual, fully-paid and royalty-free, irrevocable and worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Prior Invention.

**2.3 Assignment of Company Inventions.** Subject to Section 2.5 ("**Government or Third Party**"), and except for Inventions that I can prove qualify fully under the provisions of California Labor Code section 2870 and I have set forth in **Attachment 1,** I hereby assign, grant, and convey to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company. Any assignment of Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Inventions (and any Intellectual Property Rights

with respect thereto). Inventions assigned to the Company or its designee are referred to in this Agreement as **"Company Inventions"**.

**2.4 Obligation to Keep Company Informed.** During the period of my employment and for one (1) year after my employment ends, I will promptly and fully disclose to Company in writing (a) all Inventions authored, conceived, or reduced to practice by me, either alone or with others, including any that might be covered under California Labor Code section 2870, and (b) all patent applications filed by me or in which I am named as an inventor or co-inventor.

**2.5 Government or Third Party**. I agree that, as directed by the Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

**2.6 Enforcement of Intellectual Property Rights and Assistance.** During and after the period of my employment and at Company's request and expense, I will assist Company in every proper way, including consenting to and joining in any action, to obtain and enforce United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in all countries. If the Company is unable to secure my signature on any document needed in connection with such purposes, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act on my behalf to execute and file any such documents and to do all other lawfully permitted acts to further such purposes with the same legal force and effect as if executed by me.

**2.7 Incorporation of Software Code.** I agree that I will not incorporate into any Company software or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company.

**3. RECORDS.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by the Company) of all Inventions made by me during the period of my employment by the Company, which records shall be available to, and remain the sole property of, the Company at all times.

**4. RETURN OF COMPANY PROPERTY.** Upon termination of my employment or upon Company's request at any other time, I will deliver to Company all of Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information and certify in writing that I have fully complied with the foregoing obligation. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I

return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide the Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide the Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company is subject to inspection by Company's personnel at any time with or without notice. Prior to the termination of my employment or promptly after termination of my employment, I will cooperate with Company in attending an exit interview and certify in writing that I have complied with the requirements of this section.

5.   **NOTIFICATION OF NEW EMPLOYER.** If I leave the employ of Company, I consent to the notification of my new employer of my rights and obligations under this Agreement, by Company providing a copy of this Agreement or otherwise.

6.   **GENERAL PROVISIONS.**

   6.1   **Governing Law.** This Agreement and any action related thereto will be governed and interpreted by and under the laws of the State of California, without giving effect to any conflicts of laws principles that require the application of the law of a different state.

   6.2   **Severability.** If any provision of this Agreement is, for any reason, held to be invalid or unenforceable, the other provisions of this Agreement will remain enforceable and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law.

   6.3   **Survival.** This Agreement shall survive the termination of my employment and the assignment of this Agreement by Company to any successor or other assignee and shall be binding upon my heirs and legal representatives.

   6.4   **Employment**. I agree and understand that nothing in this Agreement shall give me any right to continued employment by Company, and it will not interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause and with or without advance notice.

   6.5   **Notices.** Each party must deliver all notices or other communications required or permitted under this Agreement in writing to the other party at the address listed on the signature page, by courier, by certified or registered mail (postage prepaid and return receipt requested), or by a nationally-

recognized express mail service. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt. Each party may change its address for receipt of notice by giving notice of the change to the other party.

   6.6   **Injunctive Relief**. I acknowledge that, because my services are personal and unique and because I will have access to the Confidential Information of Company, any breach of this Agreement by me would cause irreparable injury to Company for which monetary damages would not be an adequate remedy and, therefore, will entitle Company to injunctive relief (including specific performance). The rights and remedies provided to each party in this Agreement are cumulative and in addition to any other rights and remedies available to such party at law or in equity.

   6.7   **Waiver.** Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of that provision or any other provision on any other occasion.

   6.8   **Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

   6.9   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.

   6.10   **Entire Agreement.** This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior communications or agreements between us with respect to such matters. No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement, will be effective unless in writing and signed by me and an authorized officer of the Company. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement. If no other agreement governs nondisclosure and assignment of inventions during any period in which I was previously employed or am in the future employed by Company as an independent contractor, the obligations pursuant to sections of this Agreement titled "**Confidential Information Protections**" and "**Inventions**" shall apply.

(Signature page follows.)

2018.11.01v2

This Agreement shall be effective as of the first day of my employment with Company.

**EMPLOYEE:**

**I HAVE READ, UNDERSTAND, AND ACCEPT THIS AGREEMENT:**

*kalpit Gajera*

DocuSigned by:
9BBC5C5E88514A4...

*(Signature)*

Name: Kalpit Gajera

Title: Sr. Manager, PMO

Date: 4/11/2019

Address: 34221 Finnigan Ter, Fremont, CA 94555


**VERB SURGICAL INC.:**

**ACCEPTED AND AGREED:**


*(Signature)*

Name: _____

Title: _____

Date: _____

Address: _____

4

# ATTACHMENT 1

# INVENTIONS

**1.      Prior Inventions Disclosure.**  The following is a complete list of all Prior Inventions (as provided in Subsection ___ of the attached Employee Confidential Information and Inventions Assignment Agreement, defined herein as the "Agreement"):
**\*\*Please enter N/A if not applicable.**

☐          None

☐          See immediately below:

<u>   N/A                                                                                                                      </u>

<u>                                                                                                                                  </u>

**2.      Limited Exclusion Notification.**

      THIS IS TO NOTIFY you in accordance with Section 2872 of the California Labor Code that the foregoing Agreement between you and Company does not require you to assign or offer to assign to Company any Invention that you develop entirely on your own time without using Company's equipment, supplies, facilities or trade secret information, except for those Inventions that either:

      **a.**          Relate at the time of conception or reduction to practice to Company's business, or actual or demonstrably anticipated research or development; or

      **b.**          Result from any work performed by you for Company.

      To the extent a provision in the foregoing Agreement purports to require you to assign an Invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

      This limited exclusion does not apply to any patent or Invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or Invention to be in the United States.